# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MAJOR GEORGE TILLERY,

    Plaintiff,

        v.

JOHN WETZEL, *et al.*,

    Defendants.

NO. 3:16-CV-0235

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is the Motion for Summary Judgment (Doc. 40) filed by Defendants Michael Damore, Sean Downs, and Sharon Luquis (collectively, "Defendants"). Two First Amendment claims remain in this *pro se* civil rights action commenced by Plaintiff Major George Tillery: (1) retaliatory removal from his prison job; and (2) retaliatory misconduct. The motion for summary judgment will be granted in part and denied in part. Because Tillery failed to exhaust his administrative remedies as to his demand for compensatory and punitive damages related to his retaliatory termination claim, his request for compensatory and punitive damages with respect to that claim will be dismissed without prejudice. But, the remainder of Defendants' motion will be denied because Tillery otherwise exhausted his claims, he is able to establish a *prima facie* case as to both his retaliatory removal and retaliatory misconduct claims, and Defendants have not presented a sufficient quantum of evidence to obtain summary judgment as to either claim on their same decision defense.

## I. Background

The facts are derived from Defendants' Statement of Facts and supporting exhibits, (*see* Docs. 42-43 "Defs.' SMF", *generally*), as well as Plaintiff's Counter-Statement of Facts and supporting exhibits. (*See* Doc. 46, "Pl.'s SMF", *generally*). Plaintiff Major George Tillery ("Tillery") is an inmate currently incarcerated with the

Pennsylvania Department of Corrections ("DOC") at the State Correctional Institution at Frackville ("SCI-Frackville"). (*See* Defs.' SMF, ¶ 1; Pl.'s SMF, ¶ 1). Michael Damore ("Damore") was a Major at SCI-Mahanoy, Sean Downs ("Downs") was a Security Captain at SCI-Frackville, and Sharon Luquis ("Luquis") was a Hearing Examiner. (*See* Defs.' SMF, ¶¶ 34,54, 63; Pl.'s SMF, ¶¶ 34, 54, 63). Tillery's claims pertain to events that occurred during his incarceration at SCI-Mahanoy and SCI-Frackville in 2014 and 2015. (*See* Defs.' SMF, ¶ 3; Pl.'s SMF, ¶ 3).

From November 2014 to February 25, 2015, Tillery was a Certified Peer Specialist ("CPS") at SCI-Mahanoy. (*See* Defs.' SMF, ¶¶ 36-37; Pl.'s SMF, ¶ 36-37). According to Christine Griffin ("Griffin"), a Unit Manager at SCI-Mahanoy, she was informed by several officers that Tillery never worked as a CPS, that mental health roster inmates informed her that Tillery was not responsive to their concerns, and one inmate told her that Tillery was attempting to extort him. (*See* Def.'s SMF, Ex. "O", ¶¶ 1, 3, 5-6). Griffin also states that she had a counseling session with Tillery to reinforce the expectations of the CPS position. (*See id*. at ¶ 7). Tillery disputes that he intimated, harassed, or extorted any inmates and was not doing his job, noting that all progress and block reports he received were satisfactory. (*See* Pl.'s SMF, Ex. "A", 5). Tillery also denies that he had a counseling session with Griffin. (*See id*.). Rather, Tillery explains that on February 18, 2015, he had a conversation with Griffin where she threatened him with being designated a "Muslim combatant" if he kept filing grievances. (*See id*. at Ex. "A", 4). Later that day, there was an "investigative search" of his cell. (*See id*.). Another search of Tillery's cell occurred on February 25, 2015. (*See id*.).

On February 25, 2015, Tillery was removed from his job as a CPS by Damore. (*See* Defs.' SMF, ¶ 47, Pl.'s SMF, ¶ 47). Tillery was informed that he was removed from his position only after he was moved cellblocks by Damore, who stated that the move was to give Tillery a "new start." (*See* Pl.'s SMF, Ex. "A", 5). Damore declares that Tillery was removed from his position based on negative behavior towards other

inmates and that the removal had nothing to do with Tillery's filing of grievances or advocacy for other inmates. (*See* Defs.' SMF, Ex. "L", ¶¶ 11-12). According to Damore and Griffin, even after Tillery was moved cellblocks, he continued to harass some inmates, but Tillery disputes this allegation. (*See* Defs.' SMF, ¶ 49; Pl.'s SMF, ¶ 49).

Tillery filed grievance number 555752 concerning his removal from his CPS position. (*See* Defs.' SMF, ¶ 19; Pl.'s SMF, ¶ 19; *see also* Defs.' SMF, Ex. "B"). There is no dispute that this grievance was appealed to final review. (*See* Defs.' SMF, ¶ 18; Pl.'s SMF, ¶ 18).

On April 8, 2015, Tillery was transferred from SCI-Mahanoy to SCI-Frackville. (*See* Defs.' SMF, ¶ 51; Pl.'s SMF, ¶ 51). While Defendants state that the swap was due to Tillery's disruptive behavior, Tillery counters that he was informed at the time that it was simply an "administrative swap." (*Id*.).[1] Tillery also notes that the transfer was out of the ordinary in that it occurred early that morning and he was not given any prior notice or the opportunity to pack his personal belongings and legal papers. (*See* Pl.'s SMF, ¶ 51).

On April 30, 2015, Downs reviewed mail addressed to Tillery. (*See* Defs.' SMF, Ex. "M"). A statement prepared by Downs indicates that a suspicious substance was observed under the postage stamp. (*See id*.). The substance tested positive for suboxone. (*See id*.). Down's statement further explains:

> It has been standard procedure for us to test substances. When met with positive results, we place the inmate in RHU, issue a misconduct, have the inmate provide a urine sample for testing and place the evidence in evidence locker.

(*Id*.). Downs issued misconduct number B723372 and placed Tillery in the restricted housing unit ("RHU"). (*See* Defs.' SMF, ¶ 59; Pl's SMF, ¶ 59). Tillery was charged

---

[1] In an interrogatory answer, Defendants indicate that Tillery was "a swap with another institution for another inmate. This is normal procedure within the Department of Corrections to do with inmates." (*See* Pl.'s SMF, Ex. "K", ¶ 2).

3

with Class I #22 (possession or use of a dangerous or controlled substance) and Class I #40 (unauthorized use of the mail or telephone) misconducts. (*See* Defs.' SMF, Ex. "I", 1).

Tillery proceeded to a hearing on the misconduct before Luquis, where he was found guilty. (*See* Defs.' SMF, ¶ 63; Pl.'s SMF, ¶ 63). According to Tillery, Luquis stated that she found him guilty, she did not need any proof, and she sanctioned him to 180 days in the RHU. (*See* Defs.' SMF, ¶ 66; Pl.'s SMF, ¶ 66).

In Luquis' disciplinary hearing report, she notes, *inter alia*, that Tillery pled not guilty and stated: "Anybody could have sent me that stuff, it was a set up." (Defs.' SMF, Ex. "I"). Luquis found "Downs' written report more credible then Mr. Tillery's denial of charges #22 & #40." (*Id*.). Luquis specifically indicated that Downs' report established by a preponderance of the evidence that a letter addressed to Tillery was inspected, a substance was removed from under the stamp, and it tested positive for suboxone. (*See id*.). Thus, she concluded that Tillery was guilty and he was sanctioned with 180 days in the RHU. (*See id*.).

Tillery submitted a misconduct hearing appeal on May 7, 2015 on the grounds that the punishment was disproportionate to the offense and that the evidence was insufficient to support the decision. (*See id*.). Therein, Tillery referred to the misconduct as a "cold blooded set up", explaining that "[t]he reason I know this institution is out to get me is the so call[ed] incident happened on 4.30.15 and I got a misconduct on 4.30.15 without any investigation & there is no evidence that I told, order[ed], or ask[ed] anyone to mail anything to do with drugs." (*Id*.).

The Program Review Committee upheld Luquis' verdict, reasoning:

> Considering the type of substance and the fact that the substance was concealed in a manner that a visual inspection alone would not have detected it's presence; it is apparent that you were aware of the delivery system of the contraband and willing to facilitate its delivery into the facility.
>
> Taking into consideration the severity of the misconduct, coupled by the fact that the safety and security of the facility could have been compromised, Your sanction of 180 days

DC status is in accordance with policy and appropriate.

[ ] You have presented no compelling argument or relevant new facts to support any modification of the HEX's finding or sanction.

(*Id*.).

Tillery appealed the Program Review Committee's decision to SCI-Frackville's Superintendent Brenda Tritt ("Tritt"). (*See id*.). He reiterated his position that he was "set up." Tritt denied the appeal, stating that she was "inclined to agree with the stance of first level and am going to sustain their decision. Pursuant to DC-ADM 801, you present no compelling argument to support any modifications." (*Id*.).

Tillery then filed a final appeal to the Office of the Chief Counsel. (*See id*.). The response to that appeal provided:

> In your appeal you raise no specific issue(s), but instead repeat your version of the events to support your claim of innocence. This, of course, is the same version the Hearing Examiner rejected in finding you guilty of misconduct.
>
> An appeal is a review for error. It is not an opportunity to receive a new hearing on the merits. Findings of fact are made by the Hearing Examiner. On appeal, it is not the function of this Office to second-guess the Examiner, but only to determine whether the findings are clearly documented in the record. In your case, the findings made by the Examiner are amply supported by evidence presented at your hearing. Whether this Office might reach a different result given the same evidence is not the issue. It is sufficient that the Examiner's findings are supported by ample evidence to prevent this Office from altering those findings on appeal.
>
> For the above-stated reasons, I conclude that the issues raised for appeal do not, as a matter of law, require any further action on this misconduct. Your appeal must, therefore, be denied.

(*Id*.).

While Tillery's appeals of that misconduct were pending, his counsel sent correspondence to DOC Secretary John Wetzel disputing the validity of the facts underlying those charges. (*See* Pl.'s SMF, Ex. "R", *generally*). In particular, Tillery's counsel provided a declaration from Abdul H. Jamal, who resided at the address whose

initials appeared on the envelope to Tillery that was found to contain suboxone. (*See id*.). In his declaration, Jamal stated, in part, that he "mailed a letter to Major Tillery at the end of April 2015 but I did not put any drug, narcotic or controlled substance on the envelope or under the stamp." (*Id*.). That declaration was also sent to Tritt for consideration in May 2015. (*See id*. at Ex. "A", 15).

Based on the foregoing, Plaintiff commenced this action *pro se* on February 11, 2016. (*See* Doc. 1, *generally*). Motions to dismiss the Complaint were filed, and on August 22, 2017, all claims except the First Amendment retaliatory termination claim against Damore and the First Amendment retaliatory misconduct claim against Downs and Luquis were dismissed. (*See* Doc. 24, *generally*). Following the close of discovery, Defendants filed the instant motion for summary judgment. (*See* Doc. 40, *generally*). That motion has been fully briefed and is now ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 2556, 91 L. Ed. 2d 265 (1986); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth

of the matter . . . ." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 587, 581 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 248-49, 106 S. Ct. 2505).

The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." *Santini*, 795 F.3d at 416 (citing *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548, 2553). If this burden is satisfied by the movant, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). The nonmovant's burden is not satisfied by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Chavarriaga*, 806 F.3d at 218.

### III. Discussion

The First Amendment to the United States Constitution reads, in part, that "Congress shall make no law . . . abridging the freedom of speech . . .; or the right of the people . . . to petition the government for a redress of grievances." U.S. Const. amend. I. "In order to establish illegal retaliation for engaging in protected conduct, [a plaintiff] must prove that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (footnotes omitted) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). Two First Amendment claims remain in this action: (1) retaliation against Damore for the termination of Tillery's position as a CPS; and (2) retaliation against Downs and Luquis related to the purportedly false misconduct. Defendants seek summary judgment on both claims.

### A. Retaliatory Termination.

Tillery's first remaining cause of action asserts that Damore terminated him from his position as a CPS because of his filing of prison grievances and advocacy for other inmates. This, claims Tillery, violated his rights under the First Amendment.

7

Defendants contend that Damore is entitled to summary judgment on this claim because: (1) Tillery failed to properly exhaust his available remedies with respect to his request for compensatory and punitive damages; (2) there is no causal connection between Tillery's protected activity and his termination as a CPS; and (3) Damore would have made the same decision to terminate Tillery's employment regardless of his protected conduct.

### 1. Exhaustion.

Under the Prison Litigation Reform Act (PLRA), a prisoner is required to pursue all available administrative remedies within the prison's grievance system before bringing a civil rights action concerning prison conditions in federal court. *See* 42 U.S.C. § 1997e(a); *Ross v. Blake*, - - - U.S. - - -, 136 S. Ct. 1850, 1855-56, 195 L. Ed. 2d 117 (2016). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992, 152 L. Ed. 2d 12 (2002).

Exhaustion is mandatory and must be "proper," which requires a prisoner to "us[e] all steps that the agency holds out, and [to do] so properly (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81 90, 126 S. Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006) (emphasis in original). This means that the prisoner plaintiff must have completed "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id*. The "filing [of] an untimely or otherwise procedurally defective administrative grievance or appeal" does not satisfy the PLRA's exhaustion requirement. *Id*. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910, 923, 166 L. Ed. 2d 798 (2007). Failure to comply substantially with the procedural requirements of the

applicable prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004); *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) ("[P]risoners must complete the administrative review process in accordance with the applicable procedural rules, rules that are defined not by the PLRA, but by the prison grievance process itself.").

Finally, whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. *See Small v. Camden Cty.*, 728 F.3d 265, 268 (3d Cir. 2013); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010).

DOC Administrative Directive DC-ADM 804 governs the Inmate Grievance System. (*See* Defs.' SMF, Ex. "A"). The grievance policy provides inmates with a multi-step administrative grievance appeal process to raise and resolve issues arising during the course of their incarceration. (*Id*.). Pursuant to DC-ADM 804, inmates must first file a grievance with the Facility Grievance Coordinator at the facility where the events giving rise to the grievance occurred within fifteen working days of the event upon which the grievance is based. (*Id*.). If unsatisfied with the initial response to his or her grievance, the inmate may appeal the decision to the Facility Manager. (*Id*.) The Facility Manager may uphold the initial response, find in favor of the inmate, or remand the grievance to the Grievance Officer. (*Id*.). An inmate may appeal the Facility Manager's decision to final review by the Secretary's Office of Inmate Grievances & Appeals. (*Id*.). "An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue." *Hudson v. Carberry*, No. 15-1282, 2018 WL 6591812, at *5 (M.D. Pa. Dec. 14, 2018) (citations omitted).

While Defendants do not contest that Tillery fully exhausted his First Amendment retaliatory termination claim against Damore, they argue that he failed to exhaust with respect to his request for compensatory and punitive damages related to that cause of action. Defendants point to grievance number 555752, wherein Tillery

wrote that he "want[ed] my job back in addition to my back-pay and I want to be free from any and all retaliation from Ms. Griffin or Major Damore." (*See* Defs.' SMF, Ex. "C"). This, argue Defendants, did not exhaust the present demand for punitive and compensatory damages.

In *Spruill v. Gillis*, the Third Circuit considered whether, pursuant to DC-ADM 804, an inmate procedurally defaulted his claim for monetary relief when none of his three grievances requested money damages. *See* 272 F.3d at 233. The version of DC-ADM 804 in effect at the time provided that "[t]he inmate may include a request for compensation or other legal relief normally available from a court." *Id*. The *Spruill* court found that the prisoner was not precluded from seeking money damages in court because "an optional procedural provision cannot give rise to a procedural default." *Id*.; *see also id*. at 234 ("In sum, Spruill cannot be said to have failed to follow the regulations - and thus procedurally defaulted - in this respect. Nothing in the Grievance System Policy would have put Spruill on notice that he had to ask for money damages - or any particular form of relief at all."). The court further noted that the regulation at issue was a "far cry from, say, a regulation that reads, 'If the inmate desires compensation or other legal relief normally available from a court, the inmate shall request the relief with specificity in his/her initial grievance.'" *Id*. The Third Circuit went on to explain that if the DOC was "dissatisfied" with the its ruling, the DOC could "alter the grievance system to require more (or less) of inmates by way of exhaustion." *Id*. at 235.

The DOC has since adopted language similar to that suggested in *Spruill*. (*See* Defs.' SMF, Ex. "A", § 1(A)(12)(d)). Specifically, that section in the regulation in effect at the time Tillery filed his grievance stated: "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." (*Id*.).

The Third Circuit, in a non-precedential opinion, recently addressed the impact of the DOC's amendment to DC-ADM 804 to its holding in *Spruill*. *See Wright v.*

10

*Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018). The *Wright* court emphasized that the policy provision at issue in *Spruill* "permitted - but did not *require* - an inmate to identify the relief sought (including monetary relief) in his grievance." *Id.* (emphasis in original) (citing *Spruill*, 272 F.3d at 233). "Subsequently, the Prison amended its policy to include the mandatory language deemed lacking in *Spruill*. Indeed, as noted, DC-ADM 804 now requires an inmate to specify whether he seeks 'compensation or other legal relief normally available from a court' in his initial grievance. Since this requirement is now mandatory, the District Court rightly held that [the plaintiff] procedurally defaulted his claim for money damages by failing to request such relief in his grievance." *Id.* (internal citations omitted).[2]

Tillery here procedurally defaulted his claim for compensatory and punitive damages by failing to request such relief in his original grievance. There is no dispute that Tillery sought reinstatement, back-pay, and to be free from retaliation in grievance number 555752. (*See* Defs.' SMF, Ex. "C"). But, this grievance did not include a demand for legal relief. While Tillery argues that by requesting back-pay he adequately sought money damages in the grievance process, "the request for back pay under section 1983 seeks only equitable relief." *Laskaris v. Thornburgh*, 733 F.2d 260, 263 (3d Cir. 1984) ("a claim for compensatory and punitive damages is a legal claim"). Thus, because Tillery failed to seek legal relief in his administrative grievance concerning his allegedly retaliatory termination, he procedurally defaulted his claim for compensatory and punitive damages. *See, e.g.*, *Sanders v. Beard*, No. 9-

---

[2] Tillery also argues that the PLRA requires inmates to exhaust processes, not remedies. (*See* Doc. 45, 9). According to the *Wright* court, "[t]his argument fails. The Supreme Court has held that the Act 'requires proper exhaustion.' In this regard, 'it is the prison's requirements, [ ] not the [Act], that define the boundaries of proper exhaustion.' Here, the Prison's policy required Wright to specifically request monetary relief in his initial grievance. Because Wright failed to do so, he defaulted his claim for money damages." *Wright*, 729 F. App'x at 227 (alterations in original) (internal footnotes omitted).

1384, 2013 WL 1703582, at *6 (M.D. Pa. Apr. `9, 2013) ("Because Plaintiffs Diaz, Stewart, and Bowen did not request monetary damages, which qualifies as 'compensation or other legal relief normally available from a court,' in their grievances, they cannot do so in their Complaint. Their claims for monetary damages will be dismissed, but their claims for injunctive relief against Defendants will remain in the case and proceed to trial."). Tillery's request for compensatory and punitive damages on this claim will be dismissed.

### 2. *Prima Facie* Case of Retaliation.

As stated, a *prima facie* case of First Amendment retaliation requires proof of: (1) constitutionally protected conduct; (2) adverse action at the hand of the prison official; and (3) "a causal link between the exercise of his constitutional rights and the adverse action taken against him," or more specifically, "that his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take that action. *Rauser*, 241 F.3d at 333. Defendants do not dispute that Tillery engaged in constitutionally protected activity[3] or that he suffered adverse action.[4] Instead, Defendants challenge Tillery's ability to present a *prima facie* retaliatory termination claim solely as to causation.

As to the third prong, while causation can be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *Watson*, 834 F.3d at 422. Motivation is thus typically shown by "evidence

---

[3]     The filing of a prison grievance "implicates conduct protected by the First Amendment," *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Fantone v. Latini*, 780 F.3d 184, 193 n.8 (3d Cir. 2015).

[4]     "[T]he termination of prison employment constitutes adverse action sufficient to deter the exercise of First Amendment rights." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017); *Pepe v. Lamas*, 679 F. App'x 173, 176 n.2 (3d Cir. 2017) ("the fact that a prisoner does not have a liberty or property interest in his former prison job does not foreclose his  retaliation claim arising from the loss of that job." (alterations omitted)).

of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* "'[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.'" *Id.* at 424 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)). "[C]ausation, like any other fact, can be established from the evidence gleaned from the record as a whole." *Id.* (citing *Farrell v. Planters Liefesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). When showing causation through unusually suggestive timing, the contemplated temporal proximity must be "on the order of days or weeks." *Rink v. Northeastern Educ. Intermediate Unit*, 717 F. App'x 126, 134 (3d Cir. 2017) (citations omitted); *see also Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90, 98 (3d Cir. 2016) (span of eight days between protected conduct and alleged retaliatory conduct was "suggestive of retaliation at the *prima facie* stage."). "[W]here the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'" *Watson*, 834 F.3d at 424 (quoting *Farrell*, 206 F.3d at 280).

Based on the evidence of record, Tillery has pointed to facts demonstrating an unusually suggestive proximity between his protected activity and his removal from the CPS position, so summary judgment is not warranted. Specifically, Tillery filed a number of grievances at SCI-Mahanoy between May 2014 and February 2015, both before and after he began his job as a CPS. (*See* Pl.'s SMF, Ex. "A", 2-3). On February 18, 2015, Tillery voiced oral grievances to the SCI-Mahanoy Superintendent regarding his medical treatment, treatment of elderly inmates, and the treatment of another inmate's medical condition. (*See id.*). That same day, he was threatened by Griffin with the designation of a "Muslim combatant" if he did not cease filing grievances. (*Id.* at 4). On February 20, 2015, Tillery filed another grievance. (*See id.*). Two days later, February 22, 2015, Tillery was berated by Damore for going to the Superintendent instead of him with his issues. (*See id.*). Three days later,

February 25, 2015, Tillery was removed as a CPS. (*See id*.). The span of these events is suggestive of retaliation at the *prima face* stage. *See, e.g., Mack v. Yost*, 427 F. App'x 70, 73 (3d Cir. 2011) (allegation that prisoner lost his job one week after complaining to a supervisor was sufficient to plead the third prong). Tillery has established a *prima facie* case of retaliation with respect to his claim regarding his removal as a CPS.

### 3. Same Decision Defense.

Defendants also contend that irrespective of whether Tillery can establish a *prima facie* case of retaliation, Damore is still entitled to summary judgment based on the same decision defense. Under this defense, even where a plaintiff establishes a *prima facie* case of retaliation, "prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Watson*, 834 F.3d at 422 (quoting *Rauser*, 241 F.3d at 334).

The entirety of Defendants' argument in support of application of the same decision defense is as follows:

> Assuming Plaintiff can establish a prima facie case, there is ample evidence Damore would have made the same decision to terminate him for a legitimate reason anyway. Damore was informed that Plaintiff was harassing weaker inmates. Damore heard this from inmates and staff, including the Unit Manager. Thus, summary judgment should be granted in Damore's favor.

(Doc. 41, 14; *see also* Doc. 48, 4 ("The record shows Damore acted on what he was told for legitimate reasons. Thus, summary judgment should be granted in Damore's favor.")).

In opposition, Tillery disputes that summary judgment on the same decision defense is warranted. In particular, Tillery points to his summary judgment evidence that his progress and block reports were all satisfactory. He also notes that there were no misconduct or separations ordered, and, if he was engaged in the behavior cited by Defendants such as harassing or threatening inmates, then such a misconduct would

14

have issued.  Tillery therefore concludes that material facts are in dispute warranting trial of the issue.  (*See* Doc. 45, 19-20).  I agree.

The Third Circuit has noted that when "the record supports conflicting inferences regarding [the defendant's] motive" in taking allegedly retaliatory action, summary judgment is not appropriate.  *Watson*, 834 F.3d at 423.  That is the case here.  The record contains evidence for which a reasonable juror could conclude that Tillery was retaliated against for exercising his First Amendment rights, including Griffin's threats if he continued filing grievances and Damore's response to Tillery's oral grievances to the Superintendent.  Moreover, the record contains evidence that Tillery had positive feedback and reviews in his performance as a CPS.  While Damore points in opposition to his testimony that he would have removed Tillery as a CPS regardless of any protected activity, that alone does not support the entry of judgment in his favor.  *See Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) ("[C]redibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."); *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 739 (E.D. Pa. 2016) ("Ratifying this stated reason would require the Court to inappropriately engage in the weighing of evidence.").  Rather, on the evidence here, a reasonable fact-finder could conclude that Tillery was removed from his position as a CPS in retaliation for his protected activities.  *See*, *e.g.*, *Rauser*, 241 F.3d at 334.  So summary judgment will not be granted on the retaliatory termination claim.

## B.     Retaliatory Misconduct.

The other remaining cause of action asserts that Downs and Luquis filed and found Tillery guilty of a false and retaliatory misconduct in violation of the First Amendment based on his advocacy for himself and other inmates.  Defendants seek summary judgment on this claim on the grounds that: (1) the retaliatory misconduct claim was not exhausted; (2) there is no causal connection between Tillery's protected activity and the filing of the misconduct charges; and (3) Downs and Luquis would

15

have made the same decision to issue a misconduct and find him guilty of same irrespective of Tillery's protected conduct.

### 1. Exhaustion.

Unlike Tillery's grievance for his retaliatory termination claim which was governed by DC-ADM 804, his challenge to his allegedly retaliatory and fabricated misconduct was governed by DC-ADM 801, which provides an administrative procedure for addressing inmate violations of DOC rules and policies. (*See* Defs.' SMF, ¶ 26 & Ex. "H"; Pl.'s SMF, ¶ 26).[5]  Violations of rules or regulations can be disposed of either formally or informally under DC-ADM 801. (*See* Defs.' SMF, ¶ 27; Pl.'s SMF, ¶ 27). "An inmate who has received a misconduct citation, i.e., a violation of DOC rules and regulations with a resulting disciplinary measure, and seeks to appeal that misconduct or allege a grievance in connection with the events surrounding that misconduct, must use DC-ADM 801." *Hudson*, 2018 WL 6591812, at *6.

Pursuant to DC-ADM 801, the initial misconduct is heard by a Hearing Examiner. (*See* Defs.' SMF, Ex. "H").  A sanction is imposed if a rules violation is found. (*See id*.).  An inmate may appeal the Hearing Examiner's findings to the Program Review Committee within fifteen days of the hearing. (*See id*.)  If dissatisfied with the PRC's ruling, the inmate may file an appeal to the Facility Manager within seven days of the PRC's decision. (*See id*.).  The final level of review is an appeal to the DOC's Chief Hearing Examiner within seven days of the the

---

[5]     DC-ADM 804 states in pertinent part that "[a] grievance directly related to a specific inmate misconduct charge or a specific disciplinary sanction and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, 'Inmate Discipline' and/or DC-ADM 802, 'Administrative Custody Procedures.'" (Defs.' SMF, Ex. "A", § 1(A)(7)); *accord Hudson*, 2018 WL 6591812, at *6 ("DC-ADM 804 applies to all inmate grievances not connected with a misconduct citation.").

Facility Manager's decision.  (*See id.*).

The parties do not dispute that Tillery was issued misconduct B723372 on April 30, 2015.  (*See* Defs.' SMF, ¶ 29; Pl.'s SMF, ¶ 29).  The parties likewise agree that Tillery was found guilty of this misconduct and he appealed Luquis' verdict to the Program Review Committee, the Facility Manager, and the Chief Hearing Examiner's Office.  (*See* Defs.' SMF, ¶¶ 30-31; Pl.'s SMF, ¶¶ 30-31); *see also Hinton v. Mack*, No. 10-305, 2017 WL 4342204, at *10 (W.D. Pa. Sept. 29, 2017) ("Because Plaintiff properly appealed all the way up to the Chief Hearing Examiner's Office, Plaintiff properly exhausted his administrate remedies under DC-ADM 801."); *Harris v. Ferguson*, No. 16-1965, 2017 WL 3611752, at *3 (M.D. Pa. Aug. 22, 2017) (describing the three steps of review under DC-ADM 801, and noting that after the appeal to the Office of the Chief Counsel, "an inmate will be deemed to have exhausted administrative remedies."); *Walker v. Sec. Office of SCI-Coal Twp.*, No. 08-1573, 2010 WL 1177338, at *2-3 (M.D. Pa. Mar. 25, 2010) (stating that "the inmate has one last avenue of appeal to the Office of the Chief Counsel" and noting that "[o]nce all these steps are pursued, an inmate will be deemed to have exhausted administrative remedies.").  Defendants contend, however, that Tillery did not adequately exhaust his retaliatory misconduct claim through the DC-ADM 801 process because he "did not allege any retaliation by Downs or Luquis in his appeals. Plaintiff merely claimed he was set up.  Arguing he was set up is not the same as raising retaliation by the Defendants."  (Doc. 48, 2; *see also* Doc. 41, 11-12). Essentially, Defendants suggest that because the misconduct appeals did not use the word "retaliation," Tillery has not exhausted that claim.  I am not convinced.

In his hearing before Luquis, Tillery explained that anybody could have sent the envelope with the illegal substance and that it was a "set-up."  (*See* Defs.' SMF, Ex. "I").  After being found guilty by Luquis, Tillery appealed to the Program Review Committee, repeating his belief that it was a "set-up", elaborating that he "knew this institution [was] out to get" him because he was issued a misconduct "without any

investigation," and that he was given the maximum sentence by the hearing examiner after she stated that his "reputation proceeds" him. *(Id*.). Tillery then appealed the decision of the Program Review Committee to Superintendent Tritt, emphasizing that the security report lacked witnesses or confidential sources connecting him to any drugs, and, further, he reiterated that the charges were a "set up." (*See id*.).

Under DC-ADM 801, an appeal to the Program Review Committee "shall include a brief statement of the facts relevant to the appeal." (Defs.' SMF, Ex. "H"); *see also Mack v. Warden Loretto FCI*, 839 F.3d 286, 295 (3d Cir. 2016) (when a policy is "silent or vague" regarding the level of detail required in a grievance, an inmate must at least "alert[ ] the prison to the nature of the wrong for which redress is sought."). Tillery's appeal provided more than adequate notice of his retaliation claim in that he was alleging that the institution was out to get him, that he was "set up", and that he was found guilty based on his "reputation." Thus, Tillery sufficiently grieved his claim related to the allegedly false or fabricated misconduct he was issued and found guilty of despite the fact that he did not use the term "retaliation" in his appeals. *See*, *e.g.*, *Mack*, 839 F.3d at 295 (finding unconvincing the argument that the plaintiff's First Amendment retaliation claim was unexhausted where the "grievance never mentioned his oral complaint to Stephens about Roberts' and Venslosky's anti-Muslim conduct - the alleged protected speech that forms the basis of his retaliation claim"); *see also Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016) ("The grievance need not include legal terminology or legal theories, because the primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."); *Varela v. Demmon*, 491 F. Supp. 2d 442, 448 (S.D.N.Y. 2007) (finding First Amendment retaliation claim exhausted even though the "grievance does not use the word 'retaliation' in describing what occurred.").

## 2. *Prima Facie* Case of Retaliation.

Defendants next argue that Downs and Luquis are entitled to summary judgment on the retaliatory misconduct claim because Tillery is unable to demonstrate a causal

connection between his protected activity and the adverse action taken against him. Again, like the retaliatory termination claim, Defendants do not contest that Tillery can demonstrate that he engaged in protected conduct[6] or that he suffered an adverse action.[7] According to Defendants, no genuine issue of material fact exists on causation as to this claim because "[t]he grievance regarding classification filed before the misconduct did not involve Defendants. Advocacy for an inmate at another prison did not involve defendants. Thus, Plaintiff cannot establish the third element." (Doc. 41, 15). In opposition, Tillery points to the temporal proximity between his protected activity and the retaliatory false misconduct combined with the surrounding circumstances as sufficient to present a material issue for trial. (*See* Doc. 45, 21-23).

Causation, as explained before, can be demonstrated through, *inter alia*, an unusually suggestive temporal proximity or a pattern of antagonism coupled with timing. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A reasonable jury on the facts here could infer the requisite causal connection based on the time between Tillery's protected conduct and the issuance of the allegedly false misconduct report. Notably, Tillery engaged in a series of protected activities, including raising written and oral grievances throughout his time at SCI-Mahanoy until he was transferred to SCI-Frackville on April 8, 2015. Within days of his transfer, Tillery, through counsel, complained to DOC officials regarding his transfer, his adjusted security classification, and alleged retaliatory cell searches. (*See* Pl.'s SMF, Ex. "A", 10). On April 27, 2015, Tillery wrote to Superintendent Tritt requesting a review of his file and an adjustment of his security classification, and two

---

[6]     As noted, the filing of a prison grievance implicates protected conduct, *see Mitchell*, 318 F.3d at 530, whether the grievance is made orally or in writing. *See Mack*, 839 F.3d at 300 ("we have little doubt concluding that prisoners' oral grievances are indeed entitled to constitutional protection.").

[7]     An inmate "clearly suffer[s] consequences when . . . charged . . . with misconduct," such as "placement in restricted housing or restrictive confinement." *Watson*, 834 F.3d at 423.

days later he filed a grievance based on Superintendent Tritt's refusal to conduct such a review. (*See id.* at Ex. "A", 10-11). The next day, April 30, 2015, Tillery was charged with a misconduct. (*See id.*). The proximity between Tillery's challenges to his security classification and the misconduct charge are suggestive of retaliatory motive.

The record also contains evidence of a pattern of antagonism for which a reasonable juror could find retaliatory animus. Among other things, over an approximate period of ten (10) weeks, Tillery was told that if he did not cease filing grievances he would be designated a "Muslim combatant", he was berated for speaking with the SCI-Mahanoy Superintendent, he was terminated from his CPS position, and he was transferred facilities without notice under allegedly suspect circumstances. For these reasons as well, a jury could conclude that the misconduct charges were filed against Tillery for retaliatory reasons. Tillery has therefore demonstrated a *prima facie* case of retaliation.

### 3. Same Decision Defense.

Lastly, Defendants argue that summary judgment in favor of Downs and Luquis is warranted on the retaliatory misconduct claim pursuant to the same decision defense. Defendants contend that ample evidence exists that, irrespective of Tillery's protected conduct, Downs would have made the same decision to issue the misconduct and Luquis would still have found him guilty. This is so, Defendants' insist, because "[t]he envelope with the suspicious substance was addressed to Plaintiff. The substance was tested and yielded a positive result for suboxone. Plaintiff was found guilty of the misconduct. The finding of guilt on this quantum of evidence is enough to defeat the retaliation claim." (Doc. 41, 15). In opposition, Tillery emphasizes that an administrative finding of guilt does not bar his First Amendment retaliation claim pursuant to *Watson*. And, Tillery concludes that the quantum of evidence required to establish the same decision defense has not been met here based on the "serious disputes of material facts regarding the validity of the misconduct charges in addition

20

to circumstantial evidence supporting causation." (Doc. 45, 25). This, state Defendants in reply, does not prevent entry of judgment in their favor based on the same decision defense because Tillery is unable to refute that: (1) the envelope with the substance was addressed to him; (2) the substance tested positive for suboxone; and (3) he was found guilty of a misconduct. (*See* Doc. 48, 4).

The Third Circuit addressed this defense in *Watson*. There, the inmate plaintiff's claim arose from the alleged mishandling of his radio during a search of his cell. *See Watson*, 834 F.3d at 420. The plaintiff contended that the officer, Kline, pulled the antenna out so far from his radio that it broke, while the officer claimed that a portion of the antenna was already broken and secured by tape. *See id*. The plaintiff agreed that the antenna was secured by tape, but insisted the antenna was only loose, not broken. *See id*. Kline explained to the plaintiff that a broken radio was considered contraband and had to be confiscated, which required the completion of certain paperwork. *See id*. The plaintiff was angered when Kline, in completing that paperwork, refused to take responsibility for breaking the antenna and then also refused to prepare an incident report documenting that he broke the antenna. *See id*. The plaintiff then asked a captain for a grievance form, but that request was denied. *See id*. at 420-21.

Later that day, the plaintiff was summoned to the prison security office where a different officer, Coutts, purportedly stated that the plaintiff had given the other staff members a "hard time" by asking for a grievance form and not dropping the matter, so he was going to issue Plaintiff a misconduct. *See id*. at 421. Coutts also was claimed to have said that the plaintiff did not handle the situation in "the polite way" by insisting on filing a grievance. *See id*.

The plaintiff later completed a grievance on a form he obtained from another inmate, but before he could file it, he was issued a misconduct notice that was prepared by Coutts citing him with a Class I misconduct. *See id*. The plaintiff was ultimately found guilty of a misconduct before the hearing officer, but the charge was

21

reduced to a Class II misconduct. *See id*. Imposed as a penalty was the confiscation of the radio. *See id*. The plaintiff's subsequent appeals were denied. *See id*. Litigation ensued. *See id*. After all of the plaintiff's claims were dismissed except his retaliation claims, the remaining defendants in the action moved for summary judgment on the First Amendment claim. *See id*. The district court granted the motion, concluding that even if the plaintiff established a *prima facie* case of retaliation, judgment in favor of the defendants was warranted based on the same decision defense. *See id*. The plaintiff appealed. *See id*.

After concluding that the plaintiff presented a *prima facie* case against one of the four remaining defendants, Coutts, the *Watson* court considered whether he established the same decision defense. Citing its precedent, the Third Circuit observed that "most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence." *Id*. at 425 (citing *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002)).[8] In that regard, the court reiterated that the decisions of prison administrators in the context of disciplinary proceedings are entitled to "great deference." *See id*. To determine "whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion" they must be afforded, a court "evaluate[s] the 'quantum of evidence.'" *Id*. at 426.

The *Watson* court distinguished its facts from those in *Carter*, where, "given the force of the evidence that Carter was guilty of receiving stolen property, . . . there was

---

[8]    In *Carter*, the inmate claimed he was given a misconduct in retaliation for his functioning as a jailhouse lawyer. *See Carter*, 292 F.3d at 153. The *Carter* court found the inmate's claim unconvincing because "[e]ven if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory." *Id*. at 159. Noting the "quantum of evidence" of the inmate's misconduct, the Third Circuit was unable to "say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the broad discretion that [the court] must afford them." *Id*. (quotation and citation omitted).

no genuine issue of material fact that his misconduct citation was reasonably related to legitimate penological interests, and that Carter would have been disciplined notwithstanding his jailhouse lawyering." *Id.* (citing *Carter*, 292 F.3d at 159). The Third Circuit explained:

> Watson's situation is different. Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in the same condition for more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.

*Id.* The *Watson* court thus reiterated, consistent with Third Circuit precedent, that "a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported." *Id.* (citing *Hill v. City of Scranton*, 411 F.3d 118, 130 (3d Cir. 2005)).

In his concurrence in *Watson*, Judge Ambro observed that two questions were raised by the Third Circuit's decision in *Carter*. "First, what 'quantum of evidence is required to trigger *Carter*? And in cases where that 'quantum' has been reached, can the same decision defense nonetheless fail?" *Id.* at 427 (Ambro, J., concurring). As explained by Judge Ambro, "not every violation of prison protocols supported by some evidence will bar a First Amendment retaliation claim" in the Third Circuit. *Id.* at 431 (Ambro, J., concurring). This is so because "[i]f officials were allowed to hunt for every minor instance of misconduct in an effort to punish inmates for their speech, the First Amendment would ring hollow inside a prison's walls." *Id.* at 430. (Ambro, J., concurring). With respect to the second question left opened by *Carter*, Judge Ambro observed that the "proof that the official would not have taken the same action in the absence of constitutionally protected activity" would need to be strong. *Id.* (Ambro, J., concurring). Evidence that the official had "mixed motivations" would

not be enough, since "[t]his is the situation where the same decision defense is supposed to apply." *Id*. (Ambro, J., concurring). But, "where there is direct evidence that retaliation drove a charging decision, the defense does not shield a defendant from liability." *Id*. (Ambro, J., concurring). Judge Ambro cautioned against "overreading [ ]his concurrence," reiterating that "though a legitimate prison disciplinary report is not an absolute bar to a retaliation claim, it is probative and potent summary judgment evidence." *Id*. at 431 (Ambro, J, concurring) (internal quotation and citation omitted).[9]

Defendants have not established that the misconduct charge was supported by a sufficient quantum of evidence, so judgment will not be entered in favor of Downs or Luquis on the retaliatory misconduct claim. To be sure, there is some evidence to support the misconduct charge, *i.e.*, Tillery's name on the envelope where the suboxone was discovered. But, some evidence is not the standard in this Circuit. Notably, this is the only evidence to connect him to the contraband. There is no evidence that Tillery attempted to obtain the envelope from the mail room prior to the discovery of the suboxone, nor is there evidence that Tillery tested positive for suboxone (and it is unclear whether a urine test was conducted). Additionally, no testimony was presented from inmates or corrections officers that Tillery was using or distributing suboxone. Tillery also points to the declaration from Abdul Jamal that denied placing suboxone on the envelope, as well as Tillery's personal knowledge of the prison mail system whereby all stamps are removed from mail before delivery to an inmate, thus negating his motivation to seek contraband in such a manner. Accordingly, while there is some evidence that Tillery engaged in misconduct, the minimal showing presented does not meet the quantum of evidence standard established by *Carter* and *Watson*. *See*, *e.g.*, *Harris v. Giroux*, No. 16-38, 2019 WL

---

[9]    Judge Hardiman dissented in *Watson,* stating that "the evidence the parties have proffered on summary judgment establishes at most that a prison guard acted with mixed motive, which is not enough." *Watson*, 834 F.3d at 431 (Hardiman, J., dissenting).

330459, at *11-12 (W.D. Pa. Jan. 25, 2019) (denying motion for summary judgment on the same decision defense where only a "minimal quantum of evidence" in the form of the officer's version of events was presented to support a finding of guilt).

Distilled to its core, Defendants' same decision argument is that Tillery's finding of guilt "checkmates" his First Amendment retaliation claim. The so-called "checkmate doctrine" developed from the United States Court of Appeals for the Eighth Circuit's decision in *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994). This doctrine "provides that when a prison body finds that a person has committed an actual violation of prison rules and the finding is based on some evidence of the violation, the finding essentially checkmates the retaliation claim." *Maben v. Thelen*, 887 F.3d 252, 261 (6th Cir. 2018) (citing and rejecting *Henderson* and holding that "[a] finding of guilt at a prison misconduct hearing does not act as an absolute bar to a prisoner's First Amendment retaliation claim."). But, the "some evidence" standard does not apply in the Third Circuit as made clear by the Court of Appeals in *Watson*. *See Watson*, 834 F.3d at 425 n.24 (noting its disagreement with *Henderson* as to the applicable standard). *Henderson* is particularly inapplicable in this Circuit because, as Judge Ambro explained in his *Watson* concurrence, in the Eighth Circuit "a plaintiff has the burden to disprove the same decision" in prisoner retaliation cases, while, in contrast, the Third Circuit has placed "the burden in prisoner retaliation cases on the defendant to establish the same decision defense." *Id*. at 429 (Ambro, J., concurring) (citing *Rauser*, 241 F.3d at 333 & n.2 (adopting *Mount Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) as the applicable standard for evaluating prisoner retaliation claims)); *see also Maben*, 887 F.3d at 263 ("adopting the checkmate doctrine" would render the "*Mount Healthy* burden-shifting framework superfluous"); *but see Watson*, 834 F.3d at 432 (Hardiman, J., dissenting) (stating that the majority "neither accepts nor rejects" the "proposition" that a "certain quantum of evidence will checkmate a prisoner's retaliation claim"). While mindful that "the decisions of prison administrators are entitled to" "great deference" "in the context of

25

disciplinary proceedings," Tillery's finding of guilt does not, by itself, bar his First Amendment retaliatory misconduct claim. *Watson*, 834 F.3d at 426; *see also Maben*, 887 F.3d at 263; *Harris*, 2019 WL 330459, at *11-12. Summary judgment will therefore be denied on Tillery's claim against Downs and Luquis.

## IV. Conclusion

For the above stated reasons, Defendants' motion for summary judgment will be granted in part and denied in part. Because Tillery did not exhaust his administrative remedies with respect to his demand for compensatory or punitive damages on his retaliatory termination claim, the demand for those remedies as to that claim will be dismissed without prejudice. The motion for summary judgment will be denied in all other respects.

An appropriate order follows.


February 7, 2019                        /s/ A. Richard Caputo
Date                                           A. Richard Caputo
                                                 United States District Judge